UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

HEIDI KROUT,                          :
                                      :CIVIL ACTION NO. 3:16-cv-2055
            Plaintiff,                :
                                      :(JUDGE CONABOY)
            v.                        :
                                      :
NANCY A BERRYHILL,                    :
Acting Commissioner of               :
Social Security,                      :
                                      :
            Defendant.                :

---

**MEMORANDUM**

Pending before the Court is Plaintiff's appeal from the Commissioner's denial of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. (Doc. 1.) Plaintiff filed an application for benefits on October 2, 2013, alleging a disability onset date of June 26, 2013. (R. 15.) After Plaintiff appealed the initial denial of the claims, a hearing was held on January 28, 2015, and Administrative Law Judge ("ALJ") Scott M. Staller issued his Decision on March 11, 2015, concluding that Plaintiff had not been under a disability during the relevant time period. (R. 24.) Plaintiff requested review of the ALJ's decision which the Appeals Council denied on September 15, 2016. (R. 1-7.) In doing so, the ALJ's decision became the decision of the Acting Commissioner. (R. 1.)

Plaintiff filed this action on October 12, 2016. (Doc. 1.) She asserts in her supporting brief that the Acting Commissioner's determination should be reversed or remanded for the following

reasons: 1) substantial evidence does not support the ALJ's evaluation of the opinion of the consulting psychologist; and 2) substantial evidence does not support the ALJ's credibility evaluation. (Doc. 16 at 2.) After careful review of the record and the parties' filings, the Court concludes this appeal is properly granted.

## I. Background

Plaintiff was born on July 6, 1971, and was forty-one years old on the amended disability onset date. (R. 23.) She has a high school education and past relevant work as a cosmetologist. (*Id.*)

### A.   *Medical Evidence*

### 1.   Physical Impairments

Records from Hayshire Family Medicine span from September 5, 2012, to November 18, 2014. (R. 218-64, 265-73, 345-80.)

In September 2012, Plaintiff was seen at Hayshire by Tatiana Dalton, M.D., after having had two fainting episodes. (R. 242.) Physical and mental exams were normal. (R. 243-44.) Dr. Dalton ordered a CT scan and bloodwork and assessed fainting, hypertension, obesity, and nicotine dependence. (R. 242.) Other "Active Problems" included anxiety disorder, depression, and migraine headaches. (R. 242-43.) A September 24th visit with Marie Kellett, M.D., at Hayshire indicates that Plaintiff's CT scan of the head showed no evidence of acute infarction, hemorrhage, or mass. (R. 240.) Dr. Kellett also recommended MRI of the head and

2

an event monitor to assess the fainting episodes. (R. 238.) A later MRA done in October 2012 was also unremarkable, and Dr. Kellett noted on October 25, 2012, that she wanted Plaintiff to proceed with an event monitor and echocardiogram to further assess the fainting. (R. 232.) December 28, 2012, office notes show that Plaintiff cancelled or did not show for several appointments. (R. 228.)

Plaintiff again saw Dr. Kellett on June 27, 2013, the day after Plaintiff found her son dead in bed (and the day of her alleged onset of disability). (R. 15, 225.) Plaintiff's son had been having problems but been clean and sober for a few weeks, and his death was a possible suicide. (R. 225.) Plaintiff was distraught, crying constantly, not sleeping, and completely overwhelmed. (*Id.*)

On August 13, 2013, Plaintiff saw Dr. Kellet who assessed elbow pain, depression, anxiety, and grief reaction. (R. 220.) Dr. Kellett provided the following history:

> 42 year-old female who presents for followup of depression, anxiety and grief regarding her son who passed away almost 2 months ago. She suspects it is more of an unintentional overdoes and suicide attempt at this time. He was abusing prescription drugs she has since found out. Unfortunately most family members have started to move on and she is unable to get beyond her grief. She [has] not had any formal counseling. . . . She . . . is involved . . . with some online support groups. She is also having numbness in her left fourth and fifth fingers which [s]he thinks is coming from her elbow. She

3

> does have some discomfort.  She would like to
> be referred to an orthopedic specialist.

(R. 220.)  Under "Physical Exam," Dr. Kellett noted "tearful."  (R. 221.)  She encouraged Plaintiff to seek counseling and recommended that she see an orthopedic specialist for her left elbow discomfort and numbness.  (*Id.*)

On September 5, 2013, Plaintiff was seen for an orthopedic consultation at OSS Health by Darcy Kresge, PA-C. (R. 265-66, 279-81.)  Joseph E. Alhadeff, M.D., was the supervising phsyician. (*Id.*)  Dr. Kellett had referred Plaintiff because of left elbow pain.  (R. 265.)  OSS office records indicate that Plaintiff was working regular duty as a kennel manager and was able to perform activities of daily living.  (R. 279.)  Review of Systems indicates that Plaintiff reported joint pain, anxiety, depression, and insomnia, but she denied memory loss.  (R. 280.) Plaintiff was diagnosed with left elbow pain, ulnar neuritis, and medial epicondylitis and placed on a prednisone taper.  (*Id.*)  Plaintiff was instructed to rest the injured body part, to ice injured area, and to have further studies conducted on the area (electromyography "EMG" and nerve conduction study "NCS").  (R. 266-67, 280.)

October 9, 2013, office notes signed by supervising physician William H. Ulmer, Jr., D.O., from OSS Health indicate that Plaintiff had constant pain in her left elbow which increased with lifting, exercise, twisting and bending.  (R. 276-78.)  She reported numbness and tingling from the left hand that radiated to

4

her elbow.  (R. 276.)  Notes also show she continued to work regular duty as a kennel manager.  (*Id.*)  Cervical spine x-rays revealed "a loss of the cervical lordosis with noted early reverse cervical lordosis being observed.  Only mild disk space narrowing between C6-C7 is present."  (R. 277.)  EMG study of the left arm "did not show any nerve conduction abnormalities suggestive of cervical radiculopathy, plexopathy, myography, peripheral polymyopathy, or medial or ulnar nerve mononeuropathy."  (*Id.*)  Plaintiff was diagnosed with cervical radiculitis and medial epicondylitis of the left elbow.  (*Id.*)  Notes indicate that Plaintiff had received significant relief with Medrol Dosepak, she was prescribed a stronger prednisone taper, and she received a steroid injection.  (*Id.*)

At Plaintiff's November 26, 2013, Hayshire office visit, physical examination showed neck pain with movement to the right and left and pain over the cervical spine.  (R. 374.)  Plaintiff was assessed to have cervical disc herniation and cervical radiculopathy for which she was prescribed Meloxicam and Gabapentin.  (R. 373.)  The provider noted that Plaintiff had been seen at OSS then went to Johns Hopkins University for a second opinion because the pain was getting worse.  (*Id.*)  Plaintiff reported she was likely going to have cervical fusion on her neck over the next few months.  (*Id.*)

At Plaintiff was again seen at Hayshire on December 3, 2013, for

5

neck pain. (R. 370-72.) Dr. Kellett noted that Plaintiff reported constant, severe, and debilitating pain and she appeared to be in moderate pain throughout the visit. (R. 370-72.) She noted that Hopkins wanted to do neck surgery but Plaintiff was reluctant and wanted to seek another opinion. (R. 371.) Dr. Kellett recommended Fentanyl 25 microgram patch and Oxycodone for breakthrough pain. (*Id.*) She cautioned Plaintiff about side effects including drowsiness, recommended that Plaintiff continue her antidepressant medication. (R. 370.) Dr. Kellett's Assessment included grief reaction, cervical disc herniation, cervical radiculopathy, chronic pain syndrome, and depression. (*Id.*)

In January 2014, Dr. Kellett discontinued Fentanyl and started Oxycontin with Oxycodone for breakthrough pain. (R. 367.) Notes indicate that disability forms would be filled out. (*Id.*) Under "Physical Exam," Dr. Kellett noted that Plaintiff appeared uncomfortable. (R. 369.)

At her February 6, 2014, visit with Dr. Kellett, Plaintiff reported that she was feeling better regarding her grief/anxiety/depression, she remained reluctant to pursue surgery, and the MS Contin was working very well for her pain. (R. 365.) Under "Physical Exam," Dr. Kellett noted that Plaintiff was in no apparent distress. (R. 366.)

In March 2014, Dr. Kellett recorded that Plaintiff appeared "mildly uncomfortable," Plaintiff reported no side effects from her

medication which she said helped to control her pain but did not eliminate it. (R. 361-62.) Plaintiff reported that she continued to have struggles with the death of her son and she continued to see a "new age" chiropractor in Lancaster. (*Id.*)

In May 2014, Plaintiff reported that she was having significant pain in her elbow and the chronic neck pain continued. (R. 358.) She had scheduled an appointment at the Spine Institute in Philadelphia to get another opinion regarding neck surgery. (*Id.*) Plaintiff reported significant pain in her left elbow and was given a steroid injection which had helped in the past. (R. 358-60.) Plaintiff's medications included morphine and Oxycodone for pain. (R. 357.) Plaintiff said she was doing yoga. (R. 358.) She continued to report problems dealing with her son's death, she said she was not sleeping well, and she was having issues with her daughter. (*Id.*) Physical exam findings indicate that Plaintiff was tearful and had left elbow pain at the medial epicondyle and pain with pronation. (R. 359.)

Plaintiff was seen by John Frank Spallino, M.D., at the Laser Spine Institute in Wayne, Pennsylvania, on June 30, 2014, for review and evaluation of MRI/X-ray concerning her cervical spine pain with radiculopathy. (R. 398.) Dr. Spallino assessed spinal stenosis in the cervical region, displacement of cervical intervertebral disc without myelopathy, cervical spondylosis without myelopathy, and degeneration of cervical intervertebral

disc.  (R. 399.)  He recommended a new cervical MRI and laminectomy, foraminotomy, and decompression of the nerve root. (*Id.*)

In July 2014, Dr. Kellett reported that Plaintiff was on narcotics for chronic pain due to degenerative disc disease with radicular symptoms, her depression and anxiety worsened after the death of her son the preceding year, her migraine headaches were fairly well controlled, she was planning to have laparoscopic surgery at the Spinal Institute in the fall, she lost twenty morphine tablets and managed to survive without them, and medical issues were stable but not where Plaintiff would like them to be. (R. 355.)  Dr. Kellett also noted that Plaintiff was tearful at times during her office visit.  (R. 356.)

On August 21, 2014, Plaintiff had a neurological consultation with Albert Heck, M.D., of WellSpan Neurology.  (R. 335.)  Dr. Heck summarized his findings in a letter to Dr. Kellett on the same date:

> As you know, she is a 43 year-old with symptoms involving her left arm.  Family is neurologically unremarkable without evidence of myelopathy or radiculopathy clinically. She is locally tender at the biceps origin and also lateral elbow, and I wonder whether some of her pain complaints, including those that are "shooting" might not be tendinitis rather than neurologic.  This is also supported by the fact that her symptoms seem to worsen when she flexes her elbow suggesting a localized process.  Her chronic pain syndrome may be playing some role here as well, and certainly the issues of ongoing

> grief and depression influencing her symptoms
> should be considered. I am not sure whether
> or not surgery will improve her symptoms, but
> it is reasonable to consider. I have asked
> her to look into grief counseling and see her
> back in 6-8 weeks for reevaluation after she
> considers our long discussion today.

(R. 335.)

On October 3, 2014, Dr. Kellett noted that Plaintiff continued to deal with the grief of losing her son and commented that she was glad Plaintiff was seeing a counselor. (R. 352.) Plaintiff was to continue with pain medication and follow up with neurology. (R. 351.) Dr. Kellett reported that Plaintiff was in no apparent distress. (R. 353.)

At Plaintiff's follow-up visit with Dr. Heck on October 10, 2014, he reported that her neurological exam was mostly unremarkable and she had pain consistent with tennis elbow. (R. 324.) Dr. Heck said that Plaintiff had a suggestion of nerve root impingement at C7 on the left but he was not sure that it was a clinical issue at the time. (*Id.*) Dr. Heck suggested that, although the pain comes back when the Gabapentin wears off, Plaintiff should continue the medication to keep her pain under control and she should be followed with observation. (R. 324-25.) Dr. Heck noted that Plaintiff believed counseling was helping her and he encouraged her to continue it.[1] (*Id.*)

---

[1] February 3, 2015, correspondence addressed "To Whom It May Concern" from GSC Counseling Associates indicates that Plaintiff attended two outpatient therapy sessions to address issues of loss.

9

On October 22, 2014, Plaintiff saw Pawel Ochalski, M.D., at WellSpan Neurosurgery for a neurosurgical consultation. (R. 331.) In his summary letter to Dr. Heck, the referring physician, Dr. Ochalski noted that palpation of the cervical, thoracic, and lumbar spine did not show tenderness or muscle spasms, motor examination revealed 5/5 strength in both upper and lower extremities, deep tendon reflexes were 3+ throughout the upper and lower extremities, and Plaintiff's gait was ataxic. (R. 330.) Dr. Ochalski recommended new MRI and CT scan of the cervical spine and prescribed methylprednisolone pack with reassessment in two weeks. (*Id.*) He added that he discussed the natural history of cervical spondylitic myelopathy and a risk for quadriparesis if it is untreated. (*Id.*)

At her visit with Dr. Kellett on October 31, 2014, Dr. Kellett recorded that Plaintiff's pain had escalated, Plaintiff expected to have surgery scheduled shortly, the neurosurgeon discussed the possibility of quadriplegia if the problem was not taken care of, she was not sleeping due to pain, and she was taking more oxycodone than she should. (R. 349.) Dr. Kellett reported that Plaintiff was tearful, appeared uncomfortable, and was slightly antaxic when first getting up. (R. 350.) Dr. Kellett recommended increasing

---

(R. 462.) Plaintiff's initial session was on September 11, 2014, and her second session was on September 25, 2014. (*Id.*) The letter states that Plaintiff' "cancelled many times, then stopped attending." (*Id.*)

the dosage of the long-acting morphine which she hoped would decrease the need for oxycodone for breakthrough pain, getting another MRI and CT scan, and follow up with neurosurgery. (R. 348.)

On the same date, Plaintiff had the MRI of the cervical spine and CT of the cervical spine ordered by Dr. Ochalski. (R. 340, 342.) The CT scan showed scattered degenerative changes and referred to the MRI for better soft tissue evaluation. (R. 342.) The MRI showed "degenerative disc disease of C6-7 with severely narrowed left neural foramen, mainly due to bony spur and focal ossification of the posterior longitudinal ligament. Mild disc bulge is present. The right neural foramina is mildly to moderately narrowed." (R. 340.) The MRI also showed "[d]iffuse disc bulge at C5-6 level with facet arthropathy, greater on the right and mild narrowing of the right neural foramina. No evidence of spinal canal stenosis. Right sided facet arthropathy of C3-4 and C4-5." (*Id.*)

Plaintiff had her neurosurgical follow up appointment with Dr. Ochalski on November 5, 2014. (R. 319.) In Dr. Ochaslki's report to Dr. Heck, he acknowledged Plaintiff's worsening symptoms of neck discomfort which he rated as moderate, noted that Neurontin helped her left side arm symptoms, and also noted some low back discomfort. (R. 319.) Dr. Ochalski reported motor examination findings of 5/5 motor strength in upper and lower extremities and

11

normal gait with no evidence of ataxia. (*Id.*) He said he had reviewed the October 2014 updated MRI and CT scan which showed evidence of spondylotic changes at C5-6 and C6-7 but no evidence of cord compression. Dr. Ochalski recommended referral to physiatry to develop nonoperative treatment strategies for medical management of Plaintiff's discomfort as well as consideration of epidural injections. (*Id.*)

Office records from Plaintiff's November 18, 2014, visit with Dr. Kellett indicated that Plaintiff would follow up with pain management because the neurosurgeon decided against surgery after her recent MRI. (R. 345-46.) Plaintiff reported that she hoped to start acupuncture when she had enough money for the first appointment and she did not want to start physical therapy. (R. 346.) Plaintiff wanted to increase Gabapentin and start weaning off narcotics. (*Id.*)

On November 25, 2014, Plaintiff was seen at WellSpan Physiatry by Henry A. Richardson, M.D. (R. 381-89.) Plaintiff complained of neck pain, rated at 6/10, and leg weakness. (R. 382.) Physical examination showed appropriate affect and mood within normal limits, limited range of motion of cervical and lumbar spine, cervical facet loading present bilaterally, normal strength, and gait within normal limits. (R. 386-87.) Dr. Richardson ordered MRI of the lumbar spine and physical therapy referral. (R. 381.) He noted that cervical epidural injections would be held because

Plaintiff said that radicular pain down her arms had subsided with low dose Neurontin. (*Id.*) Dr. Richardson commented that Plaintiff had been on high dose morphine and she previously was on Oxycontin and Fentanyl and he did not recommend high-dose narcotics for treatment of chronic neck pain. (*Id.*)

The December 5, 2014, MRI of the lumbar spine indicated the following: L2-L3 mild disc dessication and disc bulge with mild indentation of the thecal sac, mild spinal canal stenosis, and mild bilateral neural foraminal narrowing; prominent Tarlov cyst scalping the posterior margin of S2 vertebral body; and some mild facet osteoarthropathy at the L4-L5 and L5-S1 levels. (R. 390.)

## B. *Opinion Evidence*

### 1. <u>Examining Consultant</u>

On November 5, 2013, Anthony J. Fischetto, Ed.D., performed a clinical psychological examination and review of documents, and completed a Medical Source Statement of Ability to do Work-related Activities (Mental). (R. 307-14.) The Medical Source Statement indicates that Dr. Fischetto concluded Plaintiff had mild to moderate limitations in many areas and a marked restriction in her ability to respond appropriately to usual work situations and to changes in a routine work setting. (R. 307-08.) He noted that factors supporting his assessment included "depressed, crying, shaky, anxious, panic attacks." (R. 308.) In the narrative portion of his report, Dr. Fischetto noted that Plaintiff was very

13

distressed and grieving about her seventeen year old son's June 2013 suicide. (R. 310.) He reported that Plaintiff last worked the day before her son died and she could not work because she could not stop crying and could not think clearly as a result of a combination of her son's death and her mental illness. (R. 312.) Mental Status Examination included the following: Plaintiff was crying, shaking, nervous and jittery; her mood and affect were depressed and anxious; she had trouble sleeping; her productivity of thought was slow; her continuity of thought was goal-directed with no looseness of association; her abstract thinking was good for similarities; her general fund of information was average; regarding concentration, she was slow for serial sevens; she was oriented to time, place, and person; remote memory, recent past memory, and recent memory were average; immediate retention and recall was poor for digit span; test judgment was good; insight was average; and reliability was good. (R. 313.) Dr. Fischetto concluded that Plaintiff's prognosis was poor and she would benefit from ongoing psychiatric and pscyhological help. (R. 314.) Regarding the effects of her impairment on functioning, he noted: in activities of daily living, Plaintiff was able to drive when not taking pain medicine for her neck, she does not like shopping or being around a lot of people, she gets nervous, and she was able to cook and clean; in social functioning, Plaintiff was limited; in concentration, persistence and pace, Plaintiff was a little slow

and appeared to be in another world and very distraught which was exacerbated by the suicide of her son. (*Id.*)

## 2. <u>Reviewing Consultant</u>

On November 19, 2013, Sharon Becker Tarter, Ph.D., a State agency consultant, reviewed records and completed a Psychiatric Review Technique ("PRT"). (R. 63-64.) Dr. Tarter concluded that Plaintiff had moderate restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persisence or pace, and no repeated episodes of decompensation, each of extended duration. (R. 63.)

## C. *Function Reports and ALJ Hearing*

## 1. <u>Plaintiff's Function Report</u>

In a Function Report dated October 11, 2013, Plaintiff said that her ability to work was limited by the loss of her son which caused insomnia and constant breaking down. (R. 151-59.) She said it was also limited by compressed discs in her neck, going for physical therapy, pain medications, she could not hold objects and could barely bend her elbow, and her anxieties. (R. 151.)

Plaintiff indicated that her ongoing hobbies included running a website, that she spent about three hours a day with others including time with her husband, time on the computer, and talking on the phone. (R. 153.) She said she goes to grief support once a week, visits with her children once a week and attends physical

therapy three times a week. (*Id.*) She also said her social activities had changed in that she didn't do a lot except visit and she didn't go out. (R. 154.) Regarding abilities listed in check-the-box form, Plaintiff indicated she was unable to do most things due to her neck, left arm, and elbow problems. (R. 154.) However, she said she could walk one-half mile before needing to rest. (*Id.*) She also said she did not follow written instructions well and she did not follow spoken instructions well because she was forgetful. (*Id.*) Plaintiff indicated that she prepared food like sandwiches and she did light housework and laundry two to three times a week for about two hours. (R. 159.)

## 2. **Third Party Fucntion Report**

Douglass Krout, Plaintiff's husband, completed a Function Report on October 12, 2013. (R. 161-68.) He said that Plaintiff's ability to work was limited because she did not sleep well and cried constantly, she was in pain most of the time, her left side was barely functional, and she may have had a minor stroke after finding her deceased son. (R. 161.) Mr. Krout said that Plaintiff does not go outside much because of depression. (R. 164.) He also noted that she continued her hobbies of reading, writing, and painting and she did them all well and often. (R. 165.) Mr. Krout indicated that Plaintiff spent time with others--she visited friends, had computer buddies, and she talked via text. (*Id.*) However, he also said her social activities had changed in that she

16

was not active anymore and tended to stay isolated. (R. 166.)

3. **ALJ Hearing**

At the January 28, 2015, hearing in Harrisburg, Pennsylvania, Plaintiff, who was represented by an attorney, stated that she was a stay-at-home mother for fifteen years, worked as a hair stylist for several years beginning in 2007, and then worked for the Dover Area Animal Hospital from 2012 to 2013 ("about a year, until my son died"). (R. 35.) The ALJ instructed the Vocational Expert ("VE"), Andrew Caparelli, that the Dover Animal Hospital job did not meet the requirements for substantial gainful activity. (*Id.*)

Plaintiff testified that she had numerous physical problems including constant pain in the neck for which she took morphine twice a day and electrical jolts down her left arm for which she took Gabapentin. (R. 36-37.) She also said she had problems with mood swings which caused insomnia and "uncontrollable bouts of losing it" and she had a panic attack about every six months. (R. 38.) Plaintiff stated that she did not have problems getting along with people but gets nervous being around people. (R. 38-39.)

Regarding household chores and related activities, Plaintiff testified that she did not cook or do housework, and she went grocery shopping with her husband once every two weeks. (R. 40.) She reported that she painted and wrote a blog. (R. 41.)

Plaintiff said that medications did not relieve all of her symptoms and her medications caused concentration issues and

17

perhaps contributed to her insomnia and appetite issues. (R. 42.)
She rated her pain with medication at six on a scale of one to ten.
(R. 44.) She said her crying spells could last all day on a bad
day and she had a bad day "every couple of days." (R. 46.)
Regarding concentration, she said that she would be doing something
and then just forget what she was doing. (R. 46.)

When asked about future treatment for her physical problems,
Plaintiff said nothing could be done for her ankle because it was
arthritis, her neck problem was arthritis and she may have a nerve
cauterization, treatment for her back was unknown because she had
just had the MRI which showed spinal stenosis and she was going to
see a neurosurgeon in February, and surgery or further treatment
for her left elbow was "on the back burner." (R. 48-49.)
Plaintiff testified that treatment for her mental health problems
included trying to see her counselor once a week for an hour and
working on getting the medications right. (R. 49.)

The ALJ asked Vocational Expert Andrew Caparelli ("VE") to
consider a person with Plaintiff's background and work experience
who could perform no greater than light work,

> could occasionally climb ramps or stairs.
> Never climb ladders, ropes, or scaffolds.
>
> They could occasionally balance, stoop,
> kneel, crouch or crawl. They must avoid
> concentrated exposure to extreme cold. They
> would be able to understand, remember and
> carry out simple instructions.
>
> They can make judgments on simple work

18

> related decisions. That they would need a
> job with only occasional decision making and
> only occasional changes in the work setting.
> They should have no interaction with the
> public. Only occasional interaction with
> coworkers or supervisors.
>
> They could maintain attention and
> concentration for two-hour segments over an
> eight-hour period, and that they could
> complete a normal work week without excessive
> interruptions from psychologically and
> physically based symptoms.

(R. 51.) The VE testified that such a person could not perform Plaintiff's past work but there would be other work available including the jobs of marker, mail clerk, and conveyer line bakery worker. (R. 52.) If reduced to the sedentary level, the individual would be able to perform jobs such as final assembler, carding machine operator, and semiconductor bonder. (R. 53.) However, if the individual were to be off task more than fifteen percent of the workday, or missed two or more days per month, the VE testified that no jobs would be available. (*Id.*) He also explained that the work would be more limited if a sit/stand option were introduced and jobs would remain at both the sedentary and light levels if the individual had only occasional use of the left upper extremity. (R. 54-55.)

**D. ALJ Decision**

In his March 11, 2015, Decision, ALJ Staller made the following Findings of Fact and Conclusions of Law:

> 1. The claimant meets the insured status
>    requirements of the Social Security Act

19

through March 31, 2018.

2.   The claimant has not engaged in
     substantial gainful activity since June
     26, 2013, the alleged onset date (20 CFR
     404.1571 et seq.).

3.   The claimant has the following severe
     impairments: degenerative disc disease
     of the cervical spine; chronic pain
     syndrome; bipolar disorder; anxiety
     disorder; and a personality disorder (20
     CFR 404.1520(c)).

4.   The claimant does not have an impairment
     or combination of impairments that meets
     or medically equals the severity of one
     of the listed impairments in 20 CFR Part
     404, Subpart P, Appendix 1 (20 CFR
     404.1520(d), 404.1525 and 404.1526).

5.   After careful consideration of the
     entire record, the undersigned finds
     that the claimant has the residual
     functional capacity to perform light
     work as defined in 20 CFR 404.1567(b)
     except she should never climb ladders,
     ropes or scaffolds.  The claimant is
     limited to occasional climbing of ramps
     or stairs, balancing, stooping,
     kneeling, crouching, and crawling.  She
     should avoid concentrated exposure to
     extreme cold.  The claimant is able to
     understand, remember and carry out
     simple instructions.  She can make
     judgments on simple work related
     decisions.  The claimant is limited to
     only occasional decision-making and only
     occasional changes in the work setting.
     She should have no interaction with the
     public.  The claimant is limited to only
     occasional interaction with co-workers
     and supervisors.  She is able to
     maintain concentration and attention for
     two-hour segments over an eight-hour
     period.  Furthermore, the claimant is
     able to complete a normal work-week
     without excessive interruptions from

psychologically or physically based symptoms.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on July 6, 1971 and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability date (20 CFR 404.1563).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from June 26, 2013, through the date of this decision (20 CFR 404.1520(g)).

(R. 17-24.)  Other relevant portions of the ALJ's Decision will be referenced in the Discussion section of this Memorandum.

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to

determine whether a claimant is disabled.[2]  It is necessary for the

Commissioner to ascertain: 1) whether the applicant is engaged in a

substantial activity; 2) whether the applicant is severely

impaired; 3) whether the impairment matches or is equal to the

requirements of one of the listed impairments, whereby he qualifies

for benefits without further inquiry; 4) whether the claimant can

perform his past work; 5) whether the claimant's impairment

together with his age, education, and past work experiences

preclude him from doing any other sort of work.  20 C.F.R. §§

404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S.

521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment,

the ALJ makes a finding about the claimant's residual functional

---

[2]  "Disability" is defined as the "inability to engage in any
substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected to
result in death or which has lasted or can be expected to last for
a continuous period of not less than 12 months . . . ."  42 U.S.C.
§ 423(d)(1)(A).  The Act further provides that an individual is
disabled

> only if his physical or mental impairment or
> impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work
> experience, engage in any other kind of
> substantial gainful work which exists in the
> national economy, regardless of whether such
> work exists in the immediate area in which he
> lives, or whether a specific job vacancy exists
> for him, or whether he would be hired if he
> applied for work.

42 U.S.C. § 423(d)(2)(A).

capacity based on all the relevant medical evidence and other evidence in the case record. 20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process. *Id.*

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that Plaintiff could perform jobs that existed in significant numbers in the national economy. (R. 23.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision. 42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). The Third

Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise. A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion. *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted). The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the ALJ to analyze all probative evidence and set out the reasons for his decision. *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 (3d Cir. 2000) (citations omitted). If he has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir.

1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions.  *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented."  *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  Where a claimed error would not affect the outcome of a case, remand is not required.  *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005).  Finally,

an ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision.  *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

Plaintiff asserts that the Acting Commissioner's determination should be reversed or remanded for the following reasons: 1) substantial evidence does not support the ALJ's evaluation of the opinion of the consulting psychologist; and 2) substantial evidence does not support the ALJ's credibility evaluation.  (Doc. 16 at 2.)

### A.    *Consulting Psychologist Opinion*

Plaintiff contends that substantial evidence does not support the ALJ's evaluation of Dr. Fischetto's opinion because he provided no valid reasons for rejecting the opinion which included the finding that Plaintiff had marked restrictions in her ability to respond appropriately to work pressures in a usual work setting and to changes in a routine work setting.  (Doc. 16 at 6-10 (citing *inter alia* R. 308).)  Defendant responds that the ALJ reasonably discounted this one aspect of Dr. Fischetto's opinion.  (Doc. 18 at 13.)  The Court concludes that remand is required for further consideration of the ALJ's assessment of Dr. Fischetto's opinion.

The regulations provide that greater deference is due an examining source than a non-examining source.  20 C.F.R. § 404.1527(c)(1).  Section 404.1527(c)(3) states the following:

> The more a medical source presents relevant
> evidence to support an opinion, particularly

26

> medical signs and laboratory findings, the
> more weight we will give that opinion. The
> better an explanation a source provides for
> an opinion, the more weight we will give that
> opinion. Furthermore, because nonexamining
> sources have no examining or treating
> relationship with you, the weight we will
> give their opinions will depend on the degree
> to which they provide supporting explanations
> for their opinions. We will evaluate the
> degree to which these opinions consider all
> of the pertinent evidence in your claim,
> including opinions of treating and other
> examining sources.

*Id.* Section 404.1527(c)(6) indicates that other factors which will be taken into account in considering how much weight to give a medical opinion include the amount of understanding the source has of disability programs and their evidentiary requirements and the extent to which the source is familiar with other information in the case.

ALJ Staller stated that he "assigns limited weight to Dr. Fischetto's Medical Source Statement (Mental) . . . . Dr. Fischetto'r opinion that the claimant has marked restrictions is not supported by the record as a whole and is not consistent with Dr. Fischetto's observation that the claimant is oriented to time, place and person." (R. 22 (citing Ex. 5F).)

The only marked restriction in the Medical Source Statement (Mental) is in Plaintiff's ability to "[r]espond appropriately to usual work situations and to changes in a routine work setting." (R. 308.) Dr. Fischetto identified factors supporting his assessment to include "depressed, crying, shaky, anxious, panic

27

attacks." (*Id.*)

The ALJ does not cite any evidence in support of the claimed conflict nor elaborate why being "oriented to time, place, and person" in a clinical setting is not consistent with the opinion that the individual would have a marked restriction in the ability to "[r]espond appropriately to usual work situations and to changes in a routine work setting" based on numerous Mental Status Examination findings. (*See* R. 308, 312, 313.) Common sense suggests that orientation to time, place, and person may be a baseline requirement for appropriate workplace responses but the latter involves far more. Thus, without additional explanation, the ALJ's asserted internal contradiction does not provide an adequate basis to undermine Dr. Fischetto's finding on the marked restriction identified.

ALJ Staller's general statement that the marked restriction "is not supported by the record as a whole," considered alone or in combination with the asserted internal contradiction, does not provide the substantial evidence required for several reasons. First, an ALJ's "mere recital of boilerplate language" does not satisfy the ALJ's obligation to explain the basis for his decision. *Cotter*, 642 F.2d at 707 n.10; *see Miller v. Colvin*, Civ. A. No. 14-1283, 2015 WL 1811296, at *4 (W.D. Pa. Apr. 21, 2015) (ALJ's assignment of little weight to doctor's Mental Residual Functional Capacity Form on bases that doctor was not a mental health

professional and his opinion was "not consistent with the record as a whole or with the claimant's treatment history" (without specifying inconsistencies) was not supported by substantial evidence and required remand); *see also Carter v. Apfel*, 220 F. Supp. 2d 393, 397 (M.D. Pa. 2000). Here, the ALJ does not identify any specific evidence of record which contradicts the marked restriction finding, and his reference to "the record as a whole" must be considered boilerplate language. (*See* R. 22.) Therefore, this Court cannot conclude his assessment of Dr. Fischetto's opinion regarding Plaintiff's marked restriction is supported by substantial evidence.[3]

This conclusion is bolstered by the fact that ALJ Staller's review of evidence related to Plaintiff's alleged mental impairments includes numerous citations to treating physician's references to the presence of factors identified by Dr. Fischetto as supportive of his opinion regarding the marked restriction. (*See* R. 21, 308.) While the ALJ also cites evidence that could be construed as indicative of less serious limitations and/or an improving condition (*see* R. 21-22), without further analysis by the

---

[3] Regarding § 404.1527(c)(6) factors--the provider's familiarity with disability programs/requirements and other information in the case--Dr. Fischetto reviewed documents of record (R. 310) and, in the Court's history of reviewing Social Security appeals, the Court is familiar with Dr. Fischetto's examining consultant role in disability cases, a role which suggests familiarity with programs and their requirements. Therefore, application of § 404.1527(c)(6) factors weighs in favor of deference to Dr. Fischetto's opinion.

ALJ, the Court can only speculate as to the evidence relied upon, a practice prohibited by the law of this Circuit in that a reviewing court cannot provide a *post hoc* rationalization for the ALJ's decision. *See*, *e.g.*, *Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health and Human Services*, 730 F.3d 291, 305 (3d Cir. 2013); *see also Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001) ("Where there is conflicting probative evidence in the record, we recognize a particularly acute need for an explanation for the reasoning behind the ALJ's conclusions, and will vacate or remand a case where such an explanation is not provided.").

Though Defendant attempts to link the ALJ's reference to "the record as a whole" with his discussion of Plaintiff's mental health treatment and activities of daily living (Doc. 18 at 15-16), the ALJ's failure to make any link himself to specific evidence cannot be rehabilitated by Defendant's *post hoc* rationalization. Just as the reviewing court cannot "supply a reasoned basis for the agency's action that the agency itself has not given," *Christ the King Manor*, 730 F.3d at 305, the defendant is likewise prohibited from doing so--the ALJ must provide justification for his conclusion in the first instance, *Fargnoli*, 247 F.3d at 42.

Consistent with the law of this Circuit, the Court cannot conclude that ALJ Staller's assessment of Dr. Fischetto's opinion is supported by substantial evidence. Therefore, remand is required for further consideration of this issue.

## B.    *Credibility Evaluation*

Plaintiff contends that the ALJ's credibility determination is not supported by substantial evidence.  (Doc. 16 at 10.)  Defendant responds that the ALJ reasonably found that Plaintiff's allegations of disabling pain were not entirely credible.  (Doc. 18 at 19.) The Court concludes that review of the ALJ's credibility determination is appropriate upon remand.

The Third Circuit Court of Appeals has stated that "[w]e . . . ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor."  *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003). An "ALJ is empowered to evaluate the credibility of witnesses," but the determination must be supported by substantial evidence.  *Van Horn v. Schwieker*, 717 F.2d 871, 873-74 (3d Cir. 1983).

ALJ Staller states that he did not find Plaintiff's allegations regarding the intensity, persistence and limiting effects of her symptoms "entirely credible for the reasons explained in this decision."  (R. 20.)  Following this statement, he sets out a review of alleged physical impairment evidence which includes citations to evidence arguably supporting alleged effects of her symptoms and evidence arguably undermining the alleged effects.  (*See* R. 20-21.)  As with his review of mental impairment evidence, the ALJ does not state specifically what evidence he relies upon or rejects and his reason for the reliance or rejection

31

with limited exceptions discussed below.  (*See* R. 20-22.)  Rather,

he summarizes his finding that Plaintiff is only partially credible

as follows:

> the objective medical evidence of record
> fails to support the claimant's complaints of
> a disabling impairment.  The claimant worked
> as a kennel manager in 2013 after her alleged
> onset date of June 26, 2013.  The undersigned
> finds the claimant is able to perform light
> work.  Furthermore, the undersigned notes
> that there are no medical source statements
> regarding the claimant's physical abilities
> in the medical evidence of record.  The
> undersigned also notes that there is no
> indication that the claimant's alleged
> migraines, insomnia, possible minor stroke,
> and a reconstructed ankle (left side) have
> caused more than minimal limitation in the
> claimant's ability to work.

(R. 22.)

ALJ Staller went on to review Plaintiff's husband's Third

Party Function Report, noting that it essentially mirrored

Plaintiff's statements in her own Function Report and he found

> claimant and the claimant's husband to be not
> fully credible.  The undersigned assigns
> limited weight to the Third Party Function
> Report (Exhibit 4E).  The opinion of the
> claimant's husband that the claimant tends to
> stay isolated (Exhibit 4E/7) is not supported
> by the record as a whole and is not
> consistent with the claimant's statement that
> she spends time with others for three hours a
> day (Exhibit 3E/4).

(R. 22.)

While there may be adequate evidence in the record to

undermine Plaintiff's credibility, the ALJ's summary assessments

fall short of satisfying the requisite standard.  Without more analysis, the ALJ's reference to Plaintiff's work as a kennel manager after her alleged onset date does not necessarily impact credibility because the ALJ determined that the job did not constitute substantial gainful activity.  (R. 35.)  The ALJ's finding that Plaintiff was capable of performing light work is a conclusion based in part on his finding that Plaintiff was not entirely credible (R. 19-22)--to say that she is partially credible because he finds she can do light work is circular at best and a variant on similar language/reasoning has been rejected by this Court and others.  *See*, *e.g.*, *Fell v. Astrue*, Civ. A. No. 3:12-CV-275, 2013 WL 6182041, at *11 (M.D. Pa. Nov. 25, 2013); *see also Bjornson v. Astrue*, 671 F.3d 640, 644-45 (7th Cir. 2012) (listing cases).  The ALJ's notation that there are no medical source statements regarding Plaintiff's physical abilities in the medical evidence of record is true, but it does not *ipso facto* support diminished credibility.  The ALJ's reference to his finding "that there is no indication that the claimant's alleged migraines, insomnia, possible minor stroke, and a recontsructed ankle (left side) have caused more than minimal limitation in the claimant's ability to work" does not save his credibility analysis because Plaintiff's function report and hearing testimony indicate that she said her arm and neck problems were the main physical impairments that impacted her ability to work (R. 36-37, 151).  Thus, the ALJ's

finding that the record does not show that other impairments limited Plaintiff's ability to work is not a basis to undermine Plaintiff's credibility.

Finally, ALJ Staller's reliance on the Third Party Function Report as a basis to undermine Plaintiff's credibility is misplaced. First, the ALJ's statement that the opinion of the claimant's husband that the claimant tends to stay isolated (Exhibit 4E/7) is not supported by the record as a whole" (R. 22) suffers from the same boilerplate language problem discussed in the preceding section of this Memorandum.

Second, the ALJ's statement that "the opinion of the claimant's husband that the claimant tends to stay isolated (Exhibit 4E/7) . . . is not consistent with the claimant's statement that she spends time with others for three hours a day (Exhibit 3E/4)" (R. 22) is not supported by a contextual review of the cited statements. In the "Social Activities" section of Plaintiff's Function Report, in answer to the question "Do you spend time with others?" and "If 'YES,' describe the kinds of things you do with others," Plaintiff responded "Husband, talk on phone, computer." (R. 153.) In answer to the follow-up question of how often she did these things, Plaintiff responded "3 hrs a day." (*Id.*) At the end of the "Social Activities" section of the form, the claimant is requested to "Describe any changes in social activities since the illnesses, injuries, or conditions began."

(R. 154.)  Plaintiff responded "I don't do a whole lot except visit.  I don't go out."  (*Id.*)

In comparison, in the "Social Activities" section of the Third Party Function Report, Plaintiff's husband answered "YES" to the question of whether Plaintiff spent time with others, adding in follow-up questions that she visits friends, has computer buddies, and talks via text and she does these things often.  (R. 165.) When asked to describe "changes in social activities since the illnesses, injuries, or conditions began," he said "she's not active anymore tends to stay isolated."  (R. 166.)

This comparison shows differences in responses and shows similarities as well.  Importantly, the ALJ's perceived contradiction between Plaintiff's response that she spends three hours a day with her husband, talking on the phone, and on the computer, and Plaintiff's husband's statement that she tends to stay isolated are not inconsistent when considered in context: Plaintiff's reported activities *take place at home* and Plaintiff indicated that her social activities have changed in that she does *not go out.*  (R. 153-54.)  Engaging in activities at home for three hours a day and a change in activities of not going out cannot be considered inconsistent with an assessment that Plaintiff's social activities have changed because she tends to stay isolated.  (R. 154, 166.)

Because ALJ Staller has not provided adequate reasons for

undermining Plaintiff's credibility, the Court cannot conclude his credibility determination is supported by substantial evidence. Therefore, upon remand, further consideration of this issue is required.

## V. Conclusion

For the reasons discussed above, the Court concludes that Plaintiff's appeal is properly granted. This matter is remanded to the Acting Commissioner for further consideration consistent with this opinion. An appropriate Order is filed simultaneously with this Memorandum.

<u>S/Richard P. Conaboy</u>
RICHARD P. CONABOY
United States District Judge

DATED: June 22, 2017